567 A.2d 1023

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Ronald G. O'SHEA, a/k/a Ronald Gary O'Shea, Appellant.**

Supreme Court of Pennsylvania.

Dec. 13, 1989.

Reargument Denied March 20, 1990.

---

386

Shelley Stark, Chief–Appellate Div. and Kim Wm. Riester, Assistant Public Defender, Pittsburgh, for appellant.

Robert E. Colville, Dist. Atty., Claire C. Capristo, Deputy Dist. Atty., Kemal Alexander Mericli, and Edward Marcus Clark, Asst. Dist. Attys., Pittsburgh, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

LARSEN, Justice.

On July 11, 1985, a jury of the Court of Common Pleas of Allegheny County convicted Ronald G. O'Shea, the appellant, of robbery and of murder of the first degree for the machete killing of Herbert Kleber and the robbery of the

store in which Mr. Kleber was working when the murder took place. The following day, that same jury sentenced appellant to death following a hearing conducted pursuant to the Sentencing Code, 42 Pa.C.S.A. § 9711. Post-trial motions were denied on December 5, 1986 by the presiding judge, the Honorable Robert P. Horgas. On February 2, 1987, Judge Horgas denied appellant's supplemental post-trial motions, and formally sentenced appellant to death in accordance with the verdict of the jury. A concurrent sentence of ten to twenty years imprisonment was imposed on the robbery conviction. This direct appeal automatically followed. 42 Pa.C.S.A. §§ 9711(h)(1) and 722(4); Pa.R.A.P. Rule 702(b).

The record evidence, viewed in the light most favorable to the Commonwealth which prevailed on the verdict, discloses the following. In the early morning hours of November 22, 1985, City of Pittsburgh police officers found the body of Herbert Kleber in the rear of the Liberty Avenue News, where the victim was employed as a clerk. His body was in a freight elevator in the rear of the store, lying face down and his hands were handcuffed to the metal grate door of the elevator about six inches off the ground. Forensic evidence established that the cause of death was multiple deep wounds to the shoulders, neck and head that had been inflicted by a heavy and large knife, consistent with wounds that would be inflicted by a machete.

One of the owners of the Liberty Avenue News had just stocked the shelves the preceding day with the victim's assistance, and thus the owner was able to inform the police of numerous items that he knew to be missing from the store. These items included one of two machetes, knives, numerous inexpensive gold chains, about fifty butane lighters, martial arts throwing stars, other jewelry, cigarettes, and cash that had been in the cash register and in an envelope containing proceeds from the sale of lottery tickets. Also missing from the store was a light gray athletic type bag that had been left in the rear of the store.

The store owner provided the investigating police officers with the names of its current and past employees, as well as samples of many of the items that had been stolen. Appellant was on the employee list and had recently been fired for stealing money. The Pittsburgh police officers, including Detective Ronald Freeman, knew appellant from his previous history in the criminal justice system.[1] On the afternoon of November 22, 1985, police officers learned that a man matching appellant's general description had been giving away gold chains and money in the downtown, Market Square, area of Pittsburgh.

Detectives Freeman and Terry Hediger decided to question appellant, and they drove out to his residence in Shaler Township, a municipality just outside of the City of Pittsburgh, to do so. Appellant had been living with his brother and sister-in-law, James and Marion O'Shea, and their daughter Eileen in Shaler Township. When these detectives arrived at the O'Shea residence later that day, appellant was not there. After identifying themselves and explaining that they wanted to question appellant, the detectives were given permission to enter the house by the owners, James and Marion O'Shea. The O'Sheas took the detectives to the family gameroom in the basement which is where appellant slept. In this room, the detectives viewed a large hunting knife and a plastic bag containing several gold chains, which were identical to items stolen from Liberty Avenue News. The O'Sheas had never seen these items previously. Additionally, in a laundry room adjacent to the game room, Mrs. O'Shea discovered a gray athletic bag that she had never seen before (which turned out to be

---

**1.** Detective Freeman knew appellant from, inter alia, a previous conviction for murder of the first degree. That conviction was reversed on the grounds that a confession had been illegally obtained, and should have been suppressed. *Commonwealth v. O'Shea,* 456 Pa. 288, 318 A.2d 713 (1974). Ultimately, the Supreme Court of Pennsylvania dismissed these charges against appellant because his retrial was not timely commenced under Pa.R.Crim.P. Rule 1100(f) as it existed at that time. *Commonwealth v. O'Shea,* 465 Pa. 491, 350 A.2d 872 (1976).

the bag taken from the store) and turned it over to the detectives.

At some point while the detectives were in the basement, appellant returned home. He knew about the homicide/robbery and suspected the detectives were there to question him. Appellant became somewhat agitated and told the detectives that he did not want to involve his family, and he requested that he go downtown with them. Appellant voluntarily accompanied the detectives to the Pittsburgh Public Safety Building.

On the ride downtown, appellant began discussing the homicide, at first denying any involvement in it. The detectives advised him not to discuss it, but he persisted and Detective Freeman then orally advised him of his constitutional *Miranda* rights. Arriving at the Public Safety Building, appellant was again advised of his *Miranda* rights, and he executed a written waiver of said rights. After giving two contradictory statements about his activities the previous evening, appellant confessed to the murder of Herbert Kleber and the robbery of the Liberty Avenue News.

Appellant told the detectives: that he had gone to the Liberty Avenue News on November 21, 1985, and asked the victim to repay him a $20.00 debt; that the victim "sucker punched" appellant; that appellant then forced the victim to the rear of the store and handcuffed him to the freight elevator; that the victim then, while handcuffed on the floor of the elevator, kicked him in his groin; that subsequently, appellant went to the front of the store and filled a gray bag with gold chains, cigarettes, knives, butane lighters and other items, and he also took cash from the cash register.

Appellant further stated that he then decided to kill the victim who knew him and could send him to jail; that he took a machete from the store, went back to the elevator, and started hitting the victim with it—he could not remember how many times he hit the victim; that he left the store, and went to the Good Time Bar in the Borough of Millvale, adjacent to the City of Pittsburgh; that at this bar and elsewhere on the evening of November 21, 1985, appellant

gave lighters, chains, cigarettes and other items from a gray bag to numerous people including the bartender, bar patrons and appellant's girlfriend; and that he had gotten rid of the machete, which was never found.

Appellant was arrested. Further investigation confirmed that appellant had indeed distributed items stolen from Liberty Avenue News to various individuals who testified against appellant at trial. Additionally, appellant was wearing a jacket at the time of his arrest which had blood stains on it. Chemical analysis showed that this blood was consistent with that of the victim (whose blood contained genetic markings shared by only two percent of the population) and inconsistent with appellant's.

Appellant was charged with homicide and robbery and, following disposition of pretrial motions, his trial began on July 9, 1986. On July 11, 1986, the jury returned a verdict of guilty of murder of the first degree and of robbery. The bifurcated sentencing proceeding required by the Sentencing Code, 42 Pa.C.S.A. § 9711, was then conducted. The Commonwealth offered only one aggravating circumstance in support of the death penalty, namely that appellant had committed the killing while in the perpetration of a felony, i.e. the robbery. 42 Pa.C.S.A. § 9711(d)(6). The defense presented psychiatric and other evidence of mitigating circumstances suggesting that appellant was, at the time of the murder, under the influence of extreme mental or emotional disturbance and that he was incapable of appreciating the criminality of his conduct or of conforming his conduct to the law. 42 Pa.C.S.A. § 9711(e)(2) and (3). The defense also presented as other "evidence of mitigation concerning the character" of the accused, that he had been sodomized as a young boy of 6–8 years and that he had been deeply affected by his mother's death when he was 16 years of age. 42 Pa.C.S.A. § 9711(e)(8).

After arguments by the defense and the Commonwealth, the jury was instructed by the court in accordance with the Sentencing Code. The jury unanimously found an aggravating circumstance—killing committed while in the perpe-

tration of a felony—which outweighed any mitigating circumstances. (The mitigating circumstances were not specified by the jury.) The jury therefore sentenced appellant to death. 42 Pa.C.S.A. § 9711(c)(1)(iv).

Our standard of review in cases of murder of the first degree in which a verdict of death has been rendered is established by the Sentencing Code, 42 Pa.C.S.A. § 9711(h), which provides:

(2) In addition to its authority to correct errors at trial, the Supreme Court shall either affirm the sentence of death or vacate the sentence of death and remand for further proceedings as provided in paragraph (4).

(3) The Supreme Court shall affirm the sentence of death unless it determines that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of an aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

(4) If the Supreme Court determines that the death penalty must be vacated because none of the aggravating circumstances are supported by sufficient evidence or because the sentence of death is disproportionate to the penalty imposed in similar cases, then it shall remand for the imposition of a life imprisonment sentence. If the Supreme Court determines that the death penalty must be vacated for any other reason, it shall remand for a new sentencing hearing pursuant to subsections (a) through (g).

We now affirm appellant's convictions, his sentence of death and his sentence on the robbery conviction.

■ Initially, we hold that the evidence was clearly sufficient, beyond a reasonable doubt, to sustain the jury's

determination that appellant was guilty of murder of the first degree. Although appellant does not challenge the sufficiency of the evidence of murder of the first degree (or the robbery conviction for that matter), this Court will, as in all appeals from a judgment of sentence of death, review the record to determine whether the evidence is sufficient to sustain the conviction for murder of the first degree. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26 n. 3, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g denied*, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983).

Appellant's first argument on appeal is predicated upon the Statewide Municipal Police Jurisdiction Act (the Act), 42 Pa.C.S.A. § 8953. Appellant claims that the Pittsburgh detectives had no authority under that Act to go to Shaler Township to investigate the homicide/robbery, and that therefore the search conducted at the O'Shea residence was illegal. Appellant argues that all of the evidence seized as a result of that search, including his incriminating statements, must be suppressed as the fruits of the alleged illegality.

Section 8953 provides:

**Statewide municipal police jurisdiction**

(a) **General rule.**—Any duly employed municipal police officer who is within this Commonwealth, but beyond the territorial limits of his primary jurisdiction, shall have the power and authority to enforce the laws of this Commonwealth or otherwise perform the functions of that office as if enforcing those laws or performing those functions within the territorial limits of his primary jurisdiction in the following cases....

Section 8953(a) then delineates six specific situations wherein an officer can go outside of his or her primary jurisdiction to make arrests, serve warrants and perform other official functions, such as: where the officer is acting pursuant to court order; service of arrest and search warrants with consent of local law enforcement agency; acting in hot pursuit; acting upon request of a local law enforce-

ment officer; and where an officer views a felony or has probable cause to believe that a felony has been committed and makes a reasonable effort to identify himself as a police officer. 42 Pa.C.S.A. § 8953(a)(1)–(6).

The suppression court denied appellant's motion to suppress the items viewed by Detectives Freeman and Hediger in the gameroom-basement which included the hunting knife, gold chains and the gray athletic bag. In its opinion supporting the denial of post trial motions, the lower court stated two grounds for the admissibility of these items: the court considered that the initial search of the O'Shea residence was authorized by subsection (6) of section 8953(a) [2]; alternatively, the court held that even if the Act had been violated, and the search was therefore illegal, suppression of the evidence obtained thereby would not be an appropriate remedy, citing *Commonwealth v. Saul*, 346 Pa.Super. 155, 499 A.2d 358 (1985) and *Commonwealth v. Mason*, 507 Pa. 396, 490 A.2d 421 (1985).

When we review the ruling of a suppression court, we must determine whether its factual findings are supported by the record. Where the defendant challenges an adverse ruling of the suppression court, we will consider only the evidence for the prosecution and whatever evidence for the defense which is uncontradicted on the record as a whole; if there is support on the record, we are bound by the facts as found by the suppression court, and we may reverse that court only if the legal conclusions drawn from thise facts are erroneous. *Commonwealth v. D'Amato*, 514 Pa. 471, 482, 526 A.2d 300 (1987). Moreover, even if the suppression court did err in its legal conclusions, the reviewing court may nevertheless affirm its decision where there are other legitimate grounds for admissibility of the challenged evidence. *Commonwealth v. Dancer*, 460 Pa. 95, 331 A.2d

**2.** Section 8953(a)(6) states that an officer can act beyond his or her primary jurisdiction in the following situation: "(6) Where the officer views an offense which is a felony, or has probable cause to believe that an offense which is a felony has been committed, and makes a reasonable effort to identify himself as a police officer."

435, 438 n. 5 (1975). Applying those standards of review, we affirm the suppression court's ruling.

The following relevant facts were found by the suppression court and are fully supported on the record. City of Pittsburgh police detectives decided to question appellant because he was a former employee of Liberty Avenue News who had recently been fired, because appellant was well known to the detectives due to his previous history with the criminal justice system, and because a man matching his general description had been giving away gold chains in Market Square, Pittsburgh. Without obtaining prior consent from any Shaler Township officials, detectives Freeman and Hediger drove to the O'Shea residence in Shaler to Question appellant on November 22, 1985. When they arrived at the residence, appellant was not home. After identifying themselves, and explaining the purpose of their presence (to question appellant about the homicide/robbery), the O'Sheas allowed the detectives to come in to look around, and the challenged items were seen by the detectives in plain view.[3] While Detectives Freeman and Hediger were in the basement gameroom, appellant returned to the O'Shea residence. Appellant was not arrested at this time, and he voluntarily accompanied the detectives to the Pittsburgh Public Safety Building, where he eventually gave a full confession after knowingly, voluntarily and intelligently waiving his constitutional rights.

■ The suppression court ruled that subsection (6) authorized the search because the officers, Detectives Free-

---

**3.** James O'Shea showed the detectives a locked foot locker belonging to appellant and offered to cut the lock off, which offer was declined. However, the detectives did call other City of Pittsburgh detectives and an assistant district attorney who prepared a search warrant to search and seize additional items in the residence. A search warrant was obtained and subsequently executed later that evening by City of Pittsburgh police detectives, accompanied on this occasion by a Shaler Township police officer. The suppression court found "the search warrant faulty, that is it lists no date on it. As a result the Court would rule that the items seized, these items seized pursuant to the execution of the warrant cannot be admitted into evidence...." Notes of Testimony (N.T.), Pretrial Proceeding, June 9, 1986 at 156. (The propriety of this ruling has not been challenged and is not before us.)

man and Hediger, had "probable cause to believe that an offense which is a felony has been committed, and [made] a reasonable effort to identify [themselves] as ... police officer[s]." *See* note 2, *supra.* We do not believe subsection (6) authorized the search in question as there was no probable cause to believe appellant had committed the crime until after the search had already begun and the knife, chains and gray bag had already been viewed. Moreover, the clear import of subsection (6) is to authorize official police action by an officer who is outside of his primary jurisdiction and there views a felony offense in that non-primary jurisdiction or has probable cause to believe that a felony has been committed in that non-primary jurisdiction. Otherwise, subsection (6) would authorize any police officer to go outside of his or her jurisdiction and make arrests or take other action whenever he or she has probable cause to believe that a felony had been committed in his or her primary jurisdiction. Such an interpretation would render subsections (1), (2) and (4) largely superfluous, and would eliminate the need to ever seek the consent of law enforcement officers within the non-primary jurisdiction. This would defeat one of the major purposes of the Act which was to promote cooperation and cohesive working relationships among municipal police departments. *Commonwealth v. Ebersole,* 342 Pa.Super. 151, 492 A.2d 436, 439 (1985).

Thus, subsection (6) does not explicitly authorize City of Pittsburgh police officers to go into another jurisdiction to investigate a crime without prior consent by responsible law enforcement officials of that jurisdiction; neither do the other subsections. However, we think it equally apparent that nothing in section 8953 prohibits a police officer from going outside of his or her primary jurisdiction to conduct the investigative activities that took place in this case.

■ Section 8953 authorizes arrests, execution of search warrants and other official police conduct outside of an officer's primary jurisdiction in six specific circumstances. We do not believe that these six specific circumstances are

all-encompassing of any activity that an officer may conduct outside of his primary jurisdiction, no matter how informal or unobtrusive. For example, if Detective Freeman had picked up the telephone to talk to appellant at his home in Shaler Township and asked appellant to come to Pittsburgh to answer some questions, would that telephone call be prohibited by section 8953 in the absence of prior consent by Shaler Township police officials, and would any "fruits" of that telephone call have to be suppressed because the Pittsburgh detectives violated section 8953? Such a telephone call is not specifically authorized by section 8953, but neither is it expressly prohibited. Similarly, we do not believe section 8953 prohibits police officers from leaving their primary jurisdiction to go into other jurisdictions to ask questions therein, or to enter a residence therein upon the consent of its owners (and full disclosure of the officers' purpose) and observe what they observe therein. Such unobtrusive police conduct is outside the scope of section 8953, and is not illegal. Any citizen of the Commonwealth could do what Detectives Freeman and Hediger did herein, namely drive to the O'Shea residence, ask them questions, enter their home with their consent and look around. In the absence of explicit legislative directives to the contrary, we will not prohibit police officers from doing that which a private citizen could do.

Accordingly, the initial search of the O'Shea residence and seizure of the items viewed in plain sight therein was not illegal under section 8953, nor under the constitutions of this state or of the United States. That warrantless search was reasonable and justified by the freely given and informed consent of the owners of the residence, James and Marion O'Shea, who obviously had authority to show the detectives their gameroom-basement area.

■ Additionally, we agree with the suppression court's alternative reason for denying suppression, i.e., that even assuming, *arguendo*, that there had been a violation of section 8953, exclusion of evidence thereby obtained would

not be required in this case.[4] In *Commonwealth v. Mason*, 507 Pa. 396, 490 A.2d 421 (1985), we held that suppression of evidence was an inappropriate remedy for a violation of the Rules of Criminal Procedure relating to the issuance and execution of a search warrant outside of a police officer's primary jurisdiction where said violation did not implicate fundamental, constitutional concerns, was not conducted in bad faith or did not substantially prejudice the accused in the sense that the search would not otherwise have occurred or would not have been as intrusive. Automatic exclusion of evidence obtained by searches accompanied by relatively minor infractions of the rules of criminal procedure would be a remedy out of all proportion to the violation, or to the benefits gained to the end of obtaining justice while preserving individual liberties. *Id.* at 407, 490 A.2d at 426, quoting *United States v. Searp*, 586 F.2d 1117 (6th Cir.1978), *cert. denied* 440 U.S. 921, 99 S.Ct. 1247, 59 L.Ed.2d 474 (1979); *but cf. Commonwealth v. Chandler*, 505 Pa. 113, 477 A.2d 851 (1984).

The Superior Court has recognized that, under *Mason*, suppression of evidence may or may not be the appropriate remedy for a violation of section 8953 of the Act, depending upon all of the circumstances of the case including the intrusiveness of the police conduct, the extent of deviation from the letter and spirit of the Act, and the prejudice to the accused. *Compare Commonwealth v. Saul*, 346 Pa.Super. 155, 499 A.2d 358 (1985); *Commonwealth v. Peppers*, 357 Pa.Super. 270, 515 A.2d 971 (1986); *Commonwealth v. Sestina*, 376 Pa.Super. 441, 546 A.2d 109 (1988): *with Commonwealth v. Merchant*, 385 Pa.Super. 264, 560 A.2d 795 (1989); *Commonwealth v. Fiume*, 292 Pa.Super. 54,

**4.** In deciding whether a suppression court erred in admitting or excluding evidence alleged to have been seized as the result of an illegal search, a reviewing court has the discretion to address either the legality of the search and seizure, the appropriateness of exclusion as a remedy for the type of illegality asserted, or both; to address and resolve one issue does not render the other moot, nor does it make discussion and resolution of the "second" issue dicta. *See United States v. Leon*, 468 U.S. 897, 924–25, 104 S.Ct. 3405, 3421–22, 82 L.Ed.2d 677 (1984) *and Commonwealth v. Mason*, 507 Pa. 396, 490 A.2d 421 (1985).

436 A.2d 1001 (1981); *Commonwealth v. Roberts*, 356 Pa. Super. 309, 514 A.2d 626 (1986). We approve of this case-by-case approach to the determination of the appropriateness of exclusion of evidence allegedly obtained in violation of the Act. Accordingly, we affirm the suppression court's alternative ruling that exclusion of the challenged evidence would not be warranted in this case even if the search was considered to be "illegal" under section 8953.

Appellant next asserts that the trial court erred in admitting certain demonstrative evidence, namely a photograph of the corpse, an illustration of the victim's wounds with a drawing of a machete superimposed, and a machete similar to the machete believed to be the murder weapon, claiming that the prejudicial nature of said evidence outweighed its probative value. We disagree.

Demonstrative evidence which may tend to inflame the jury is admissible in the discretion of the trial judge, and an appellate court will not disturb his or her ruling in the absence of abuse of that discretion; it is not for an appellate court to usurp the function of the trial court to balance the alleged prejudicial effect of the evidence against its probative value. *Commonwealth v. Bartlett*, 446 Pa. 392, 400, 288 A.2d 796, 799–800 (1972); *Commonwealth v. Cargo*, 498 Pa. 5, 15, 444 A.2d 639, 644 (1982).

The Commonwealth introduced one 8″ × 11″ black and white photograph of the corpse, showing the body lying face down on the floor of the freight elevator and his hands handcuffed to the metal grate door of the elevator about six inches off the floor. The victim's head and shoulders are substantially obscured by the metal grate and shadows cast thereby, and the wounds are not graphically shown by this photograph. Splattered blood is apparent in the photograph. The Commonwealth offered the photograph to demonstrate that it would have been unlikely that the victim could have kicked the appellant in his groin as appellant stated to the police, a factual question that has a bearing on appellant's state of mind and whether the homicide was premeditated and deliberate. A photograph of a corpse

which is judged not inflammatory is admissible if it is relevant and can assist the jury in understanding the facts; a photograph that is gruesome or potentially inflammatory is admissible if it is of such essential evidentiary value that its probative value clearly outweighs the likelihood of inflaming the minds and passions of the jurors. *Commonwealth v. Edwards*, 521 Pa. 134, 555 A.2d 818, 827 (1989). We find no abuse of discretion in the trial court's determination that the photograph was not inflammatory and that it was relevant and helpful to the jury.

Similarly, we find no abuse of discretion in the admission of the illustration of the victim's wounds with a drawn machete superimposed or of the machete that was similar to the murder weapon. The illustration was not particularly inflammatory and was helpful and relevant on the issue of specific intent to kill in showing the exact location, nature and extent of the injuries. *Commonwealth v. O'Searo*, 466 Pa. 224, 239–40, 352 A.2d 30, 37–38 (1976) (use of deadly weapon on vital part of body supports inference of specific intent to kill). The machete was the twin of the missing machete that had also been displayed in the store the day of the murder, and in light of appellant's admissions that he took a machete from the store, repeatedly hit the victim with it, and disposed of this machete, the matching machete was highly relevant and probative. The trial court did not abuse its discretion in admitting this demonstrative evidence.

Appellant's remaining contentions on appeal deal with the sentencing proceeding. He first argues that an erroneous evidentiary ruling precluded him from introducing a mitigating circumstance to the jury in violation of his constitutional right to introduce any evidence of mitigation involving the character and record of the accused. *Hitchcock v. Dugger*, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987). This issue is without merit, but it requires some elaboration.

In 1976, appellant was arrested and charged with robbery in circumstances entirely unrelated to the murder

and robbery presently before this Court. He was eventually convicted on these charges, and was imprisoned thereon. While in jail pending prosecution on the 1976 robbery charges, another inmate, Charles "Zeke" Goldblum, allegedly approached appellant and offered to pay him to kill four people, including Detective Freeman and his partner at that time. Appellant contacted Detective Freeman and informed him of this Goldblum solicitation. Goldblum was charged with four counts of criminal solicitation, although these charges were eventually nolle prossed.

In the case before us now, an *in camera* proceeding was conducted after appellant had been convicted but before his sentencing hearing commenced. This proceeding concerned the scope of Detective Freeman's testimony concerning the above events of 1976 regarding the Goldblum solicitation. Defense counsel intended to call Detective Freeman as a mitigation witness for the defense to show that appellant had saved the lives of Detective Freeman and his partner and had foiled Goldblum's murder plot.

At this *in camera* proceeding, Detective Freeman testified that appellant told him that he had contacted the detectives in 1976 because "you [the detectives] treated me fairly. You were both gentlemen. He [appellant] didn't want to see us get hurt." N.T. Sentencing Hearing at 441. Detective Freeman also testified, however, that appellant had asked the detectives if they could "help" him secure lenient treatment in his prosecution on the 1976 robbery charges. According to Detective Freeman, appellant and the detectives reached an agreement whereby the detectives would help appellant in exchange for appellant's informing them of the Goldblum solicitation and his cooperation in prosecuting Goldblum for solicitation. From the record of the *in camera* proceeding, and from argument on appellant's post-trial motions, written evidence of such an agreement could not be located in the Commonwealth's files, despite due diligent efforts by Detective Freeman and the assistant district attorney in this case.

Defense counsel William Brennan, representing appellant in this case at trial and sentencing, had learned during his pretrial investigation that appellant had warned Detective Freeman and his partner in 1976 of the Goldblum solicitation, and defense counsel had some brief discussions with Detective Freeman about this incident. N.T. *id.* at 448–50 and Post-trial Arguments, October 20, 1986 at 21. According to Mr. Brennan, Detective Freeman confirmed that appellant had warned the detectives about the Goldblum solicitation, but did not tell Brennan during these pre-trial interviews that appellant had been incarcerated at the time or that his warning was given as part of a deal or agreement with the detectives to get help in the prosecution on the 1976 robbery charges.

Defense counsel requested the court to restrict crossexamination of Detective Freeman so that the Commonwealth could not elicit the fact of appellant's incarceration in 1976 on robbery charges, or bring out appellant's expectation of help and/or agreement to secure such help as a possible motivation for his warning the detectives. The court ruled that the Commonwealth would not be precluded from cross-examining Detective Freeman on these matters. Defense counsel decided, therefore, not to call Detective Freeman as a defense witness in mitigation.

Appellant claims this ruling was erroneous and prejudiced him for several reasons. First, he argues that the court's ruling violated the general rule which prohibits the Commonwealth from introducing evidence of prior criminal conduct of the accused. While the *general* rule does prohibit such evidence, it is obvious that the rule is subject to numerous exceptions. *Commonwealth v. Billa,* 521 Pa. 168, 555 A.2d 835, 840 (1989). The exceptions are not narrowly confined, as appellant suggests, but instead cover a wide range of situations wherein the evidence is not offered solely to portray the accused as a bad actor, but for some other legitimate purpose where the probative value of the evidence outweighs the potential prejudice to the accused. *Id.*

There is no question that the probative value of the challenged evidence in this case outweighed the potential prejudice to the appellant, and was admissible at the sentencing hearing. A defendant is undoubtedly allowed to present any evidence "relevant and admissible" to any mitigating circumstance, including any evidence "concerning the character and record of the defendant...." 42 Pa. C.S.A. § 9711(a)(2) and (e)(8); *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986). However, it is equally clear that the defendant is not entitled to present, without challenge or rebuttal by the Commonwealth, false or misleading evidence or to create a false impression of his character or record. *Commonwealth v. Duffey,* 519 Pa. 348, 548 A.2d 1178, 1188 (1988).

Defense counsel sought to present an incomplete and one-sided picture regarding appellant's intervention in a murder plot on behalf of its intended victims, Detectives Freeman and his former partner by creating the impression that his motives were entirely altruistic. While appellant was entitled to present that evidence and to attempt to create such an impression, the Commonwealth was also entitled to present evidence to the jury suggesting other or additional motives for appellant's intervention, namely an expectation of favorable treatment or help from the detectives in his pending criminal prosecution for robbery.

In *Commonwealth v. Evans,* 511 Pa. 214, 512 A.2d 626, 631–32 (1986), this Court stated:

whenever a prosecution witness may be biased in favor of the prosecution because of outstanding criminal charges or because of any non-final criminal disposition against him within the same jurisdiction, that possible bias, in fairness, must be made known to the jury. Even if the prosecutor has made no promises, either on the present case or on other pending criminal matters, the witness may hope for favorable treatment from the prosecutor if the witness presently testifies in a way that is helpful to the prosecution. And if that possibility exists, the jury should know about it.

The jury may choose to believe the witness even after it learns of actual promises made or possible promises of leniency which may be made in the future, but the defendant, under the right guaranteed in the Pennsylvania Constitution to confront witnesses against him, must have the opportunity at least to raise a doubt in the mind of the jury as to whether the prosecution witness is biased. It is not for the court to determine whether the cross-examination for bias would affect the jury's determination of the case.

*See also Commonwealth v. Jeffrey D. Hill,* 523 Pa. 270, 566 A.2d 252 (1989). Just as a defendant must be given the opportunity to cross-examine such a prosecution witness on his possible motivations for cooperating with the Commonwealth where the witness faces outstanding criminal charges, so too must the Commonwealth be given the opportunity to explore a defendant's possible motivations for prior cooperation with the police or Commonwealth where that prior cooperation is relevant to a pending prosecution and is offered by the defendant as beneficial to the defense.

■ Next, appellant argues that the court should have limited cross-examination of Detective Freeman because of an asserted violation of his right to discovery under the rules of criminal procedure and under the due process clause. Pa.R.Crim.P. Rule 305; *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Appellant asserts that his pretrial request for "all statements of the accused and of witnesses" encompassed Detective Freeman's statements about the deal or arrangements that this witness testified to regarding appellant's intervention in the Goldblum matter. Because the defense did not hear about these deals or arrangements until after trial had commenced, appellant asserts that his discovery rights had been violated and that Detective Freeman should have been precluded from testifying as to these matters. This argument is specious.

Detective Freeman's knowledge of appellant's requests for help and/or of any deals or agreements was not exculpatory *Brady* material. Appellant's pretrial discovery request for statements of the accused and of witnesses in the possession of the *Commonwealth* and for *Brady* material did not specifically ask for any information regarding the "Goldblum incident," and appellant's omnibus pre-trial motion did not even list Detective Freeman among the witnesses whom the defense intended to call at trial. There is no evidence in the record that the Commonwealth or Detective Freeman withheld exculpatory information from appellant. The record does support an inference that, in brief interviews with Detective Freeman prior to trial, he (Freeman) did not explain to counsel that appellant had discussed or requested a deal or help in his robbery prosecution, but there is no evidence that this "omission" was anything but inadvertent. Moreover, assuming *arguendo* only that information regarding deals or expectations of leniency had been improperly withheld from appellant, the Commonwealth could not be precluded thereby from introducing the facts and circumstances surrounding appellant's incarceration and pending prosecution for robbery and arguing to the jury from those facts alone that appellant's motivation was the expectation of favorable treatment. *See Commonwealth v. Evans, supra.* Accordingly, there was no violation of appellant's discovery rights, nor any abuse of discretion in the trial court's ruling refusing appellant's request to restrict cross-examination of Detective Freeman.

Appellant next contends that the trial judge, the Honorable Robert P. Horgas, erred in refusing to recuse himself upon defense motion at the sentencing proceeding, and in failing to grant appellant's request for a three judge panel to consider this recusal issue on post-trial motions. We disagree.

Judge Horgas was a former assistant district attorney in Allegheny County, and in 1976 he prosecuted appellant for the robbery for which he was incarcerated when Goldblum allegedly solicited him. The parties were aware of this

prior to trial, but no request for recusal or disqualification was made at that time. We have already discussed how the Goldblum solicitation matter, and Detective Freeman's recollection of that incident, became relevant at the sentencing hearing when defense counsel attempted to restrict the scope of cross-examination of the detective. At that *in camera* proceeding, defense counsel claimed surprise and also argued that, because no written proof of the existence of any deal or agreement had been located, Detective Freeman should not be permitted to discuss it.

Detective Freeman insisted that there had been such a deal or agreement, despite being unable to locate same. There was no suggestion on this record, however, that Judge Horgas, as prosecuting attorney, did know or would likely have known about such an agreement. In fact, the detective testified that it would not have been the policy to inform the prosecuting attorney but that a supervising attorney would have been informed of appellant's cooperation; he did not believe Judge Horgas would have been informed of this matter. N.T. Sentencing Hearing at 440.

In this context, Judge Horgas made gratuitous, unsolicited remarks at the *in camera* proceeding that he had never been contacted or informed about any deals or agreements regarding appellant and the Goldblum solicitation, and that appellant's robbery prosecution was handled the same as any other. N.T. *id* at 446, 457. Appellant now claims that the trial judge erred in denying his motion to recuse because, by his remarks, he became a witness on a factual matter in dispute, namely matters pertaining to appellant's former prosecution which had become relevant to the current sentencing hearing.

There is no *per se* rule that a judge who had formerly prosecuted a defendant must disqualify his or her self from presiding over a trial on unrelated charges against that defendant; to the contrary, absent "some showing of prejudgment or bias we will not assume a trial court will not be able to provide a defendant a fair trial based solely on prior prosecutorial participation." *Commonwealth v. Darush,*

501 Pa. 15, 22, 459 A.2d 727 (1983). *See also Commonwealth v. Perry,* 468 Pa. 515, 364 A.2d 312 (1976). It is the burden of the party asserting that a judge should be disqualified to make sufficient allegations of bias, prejudice or unfairness necessitating recusal, and a failure to do so will result in denial of the recusal motion. *Reilly by Reilly v. Southeastern Pennsylvania Transit Authority,* 507 Pa. 204, 218, 489 A.2d 1291 (1985). The trial court may ordinarily dispose of the petition for recusal on its own without hearing where the court believes there is no merit to the petition, and the complaining party may assert the issue of recusal on appeal (if any appeal is taken). *Commonwealth v. Darush, supra; Reilly by Reilly, supra.* If a judge rules that he or she can hear and dispose of a case fairly and without prejudice, that decision will not be disturbed on review absent an abuse of discretion. *Reilly by Reilly, supra* 507 Pa. at 221, 489 A.2d 1291, quoting *Crawford's Estate,* 307 Pa. 102, 160 A. 585 (1932). Where a judge has personal knowledge of disputed facts or is a witness in a proceeding, the judge should disqualify his or herself from further proceedings. *Municipal Publications, Inc. v. Court of Common Pleas,* 507 Pa. 194, 489 A.2d 1286 (1985).

Applying these principles to the instant case, the trial court did not abuse its discretion in denying the motion to recuse or the post-trial motion to convene a three judge panel to hear and decide the recusal issue. Judge Horgas was not a witness in this proceeding, and his unsolicited, gratuitous comments made *in camera* could not have affected the jury's determination or deliberations. Moreover, while those comments were tangentially related to a matter in dispute, the substance of those comments was not in dispute. All that Judge Horgas said was that, as prosecuting attorney, he knew nothing about any deals or agreements or of appellant's cooperation on the Goldblum solicitation. At most, this is merely corroborative of Detective Freeman's own testimony that the prosecuting attorney would not have been so informed, and of the fact that no written evidence of any deal or agreement could be located.

Appellant did not propose to call Judge Horgas as a witness, and if the judge were asked to be a witness he could have, at his discretion, declined since his "testimony" on this matter would have been cumulative, would not have contradicted anything that had been said, and would have been of minimal importance. There was no abuse of discretion.

Appellant raises several additional challenges to the imposition of the death penalty, all of which have been previously addressed and resolved by this Court in prior cases. We will discuss these issues seriatim.

 Appellant argues that aggravating circumstance number 6, 42 Pa. C.S.a. § 9711(d)(6) is unconstitutional on its face, and as applied to him, because this circumstance— the killing was committed while in the perpetration of a felony—fails to present sufficiently special factors to justify the extreme penalty of death. There is no question that it is within the discretion and authority of the legislature to establish the aggravating circumstances which that body deems of sufficient weight and/or heinousness to warrant the imposition of the death penalty. *Commonwealth v. Zettlemoyer, supra; Commonwealth v. DeHart*, 512 Pa. 235, 263–64, 516 A.2d 656 (1986). There is no question that the death penalty may constitutionally be imposed for a murder of the first degree that is committed while in the perpetration of a felony. *Commonwealth v. DeHart, supra* at 512 Pa. 260–61, 516 A.2d 656; *Commonwealth v. Blystone*, 519 pa. 450, 549 A.2d 81, 93 (1988), *cert. granted* —— U.S. ——, 109 S.Ct. 1567, 103 L.Ed.2d 934 (1989).

 Appellant next contends that the jury instructions at the sentencing phase "were unconstitutional and insofar as they incorporated the death penalty statute, the statute is unconstitutional." Brief for Appellant at 52. The court instructed the jury, in accordance with the Sentencing Code, that its verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstances or if the jury unanimously finds that the aggravating circumstance (only one was

argued by the Commonwealth) outweighs any mitigating circumstances, and that the verdict must be a sentence of life imprisonment in all other cases. N.T. Sentencing Hearing at 564, 568; 42 Pa. C.S.A. § 9711(c)(1). Appellant argues that this instruction, by use of the word "must," contains a mandatory directive to the jury and unconstitutionally limits the discretion of the jury. Appellant's argument is convoluted and takes the court's instructions out of context. Moreover, we have made it clear that the sentencing scheme and instructions of which appellant complains do not unconstitutionally limit the jury's discretion nor constitute a mandatory directive or conclusive presumption that death is the appropriate punishment. *Commonwealth v. DeHart, supra* at 512 Pa. 257, 516 A.2d 656, *quoting Commonwealth v. Peterkin,* 511 Pa. 299, 326–28, 513 A.2d 373, 387–88 (1986).

■■■ It is further alleged that the jury instructions violated the mandate of the Supreme Court of the United States in *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), which held that individual jury members must not be precluded by statute or instructions from individually determining what he or she believed to be the mitigating circumstances established by the evidence. The unanimity instructions in Maryland created the unacceptable risk that individual jurors might have believed that, unless all unanimously agreed as to the existence of a particular mitigating circumstance, none of the jurors could consider such circumstance in his or her decision as to whether death was the appropriate penalty. Pennsylvania's sentencing scheme and jury instructions do not present this same problem and do not preclude an individual juror from considering and weighing any mitigating circumstance in his or her deliberations. *Commonwealth v. Frey,* 520 Pa. 338, 554 A.2d 27, 30–31 (1989); *Commonwealth v. Billa,* 521 Pa. 168, 555 A.2d 835, 843–44 (1989).

Finally, appellant argues that placing the burden of proof on the defendant to prove mitigating circumstances by a preponderance of the evidence is unconstitutional and invalidates the sentencing process. This assertion has been

addressed by this Court and resolved against appellant. *Commonwealth v. Zettlemoyer, supra* 500 Pa. at 64–66, 454 A.2d 937.

We have conducted the independent review required by the Sentencing Code, 42 Pa. C.S.A. § 9711(h), and we determine that the evidence clearly establishes the aggravating circumstance of killing while in the perpetration of a felony and that the sentence of death was not the product of passion, prejudice or some other arbitrary factor. 42 Pa. C.S.A. § 9711(h)(3)(i) and (ii). We have also reviewed the data and information compiled by our Administrative Office of Pennsylvania Courts regarding capital cases under the Sentencing Code, *see Commonwealth v. Frey,* 504 Pa. 428, 475 A.2d 700, 707–08 (1984), *cert. denied* 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984), and Appendix attached thereto which forms the baisis for the AOPC data, and we find that the sentence of death imposed in this case is not excessive or disproportionate to the sentences imposed in similar cases. 42 Pa. C.S.A. § 9711(h)(3)(iii). *Commonwealth v. DeHart, supra* 512 Pa. at 264, 516 A.2d 656.

The judgments of sentence are, therefore, affirmed.[5]

ZAPPALA, J., concurs in the result.

---

**5.** The prothonotary of the Western District is directed to transmit, as soon as possible, the full and complete record of the trial, sentencing proceeding, and review by this Court to the Governor, 42 Pa. C.S.A. § 9711(i).