J-E02001-24

2024 PA Super 222

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| STEVEN G. EAKIN | : | No. 1113 WDA 2021 |

Appeal from the Order Entered September 8, 2021
In the Court of Common Pleas of Venango County Criminal Division at
No(s): CP-61-CR-0000647-2017

BEFORE: LAZARUS, P.J., BOWES, J., DUBOW, J., NICHOLS, J., MURRAY, J.,
McLAUGHLIN, J., KING, J., SULLIVAN, J., and BECK, J.

DISSENTING OPINION BY SULLIVAN, J.: **FILED: September 25, 2024**

The Majority thoroughly recapitulates the record and summarizes the

law governing this appeal from the order granting the pre-trial motion to

suppress filed by Steven G. Eakin ("Eakin"). It is uncontested that the traffic

stop conducted by Polk Borough Police Department Chief Edward E. Sharp, Jr.

("Chief Sharp") in Frenchcreek Township was not authorized by the

Intergovernmental Cooperation Act ("ICA"),[1] that the Commonwealth failed to

establish that any exception to the Municipal Police Jurisdiction Act ("MPJA")[2]

applied, and that the traffic stop therefore violated the MPJA. Thus, the only

issue in dispute is whether the trial court's suppression was appropriate under

the three-part test set forth in **Commonwealth v. O'Shea**, 567 A.2d 1023

(Pa. 1989).

---

[1] **See** 53 Pa.C.S.A. §§ 2301-2317.

[2] **See** 42 Pa.C.S.A. §§ 8951-8955.

While the Majority agrees that the traffic stop was intrusive under the first prong of **O'Shea,** it holds that (1) any violation of the MPJA violated only the letter of the MPJA, not its spirit, because of Chief Sharp's "textbook example" of good faith; and (2) the violation of the MPJA did not result in prejudice, and thus reverses the trial court. I am constrained to disagree with the Majority's analysis of the last two **O'Shea** factors and, consequently, respectfully dissent.

This Court has provided that, where there is a violation of the MPJA, courts must apply the three-prong **O'Shea** test on a case-by-case basis to determine whether a violation of the MPJA warrants suppression of evidence:

> The factors to be considered in applying this case-by-case approach consist of all the circumstances of the case including [1] the intrusiveness of the police conduct, [2] the extent of deviation from the letter and spirit of the [MPJA], and [3] the prejudice to the accused. . . . The . . . spirit, or purpose of, the MPJA is to proscribe investigatory, extraterritorial forays used to acquire additional evidence where probable cause does not yet exist.
>
> [This] unquestionably sets forth the proper standard this Court is to employ in determining whether the exclusionary rule should act to suppress evidence obtained pursuant to an MPJA violation.

**Commonwealth v. Hobel**, 275 A.3d 1049, 1058 (Pa. Super. 2022) (quoting **Commonwealth v. Henry**, 943 A.2d 967, 971-72 (Pa. Super. 2008)) (internal citations omitted).

In addition to a violation of the ICA, the Commonwealth concedes there was an MPJA violation, but argues that suppression was not warranted

because, under the *O'Shea* test, the stop and subsequent arrest was valid. Commonwealth's Brief at 15-16, 17. *Accord* Maj. Op. at 8 (noting the Commonwealth has conceded the MPJA was violated and "it is evident that none of the exceptions apply").

I agree with the learned Majority that in the absence of an applicable exception under the MPJA authorizing the traffic stop at issue, this Court is required to apply *O'Shea* to determine whether suppression was the appropriate remedy.[3]  However, I discern no error of law by the trial court in granting Eakin's suppression motion.

The first prong of the *O'Shea* test concerns the intrusiveness of the police conduct.  We must consider the "level of intrusion of a stop that results in an arrest, since only in this circumstance does the issue of possible suppression of evidence arise." *Hlubin*, 208 A.3d at 1048 (plurality). We need not belabor this point, however, because the Majority concludes the stop was unquestionably intrusive, and therefore militates in favor of suppression. *See* Maj. Op. at 10 (applying *Hlubin* and concluding the stop "involved a high level

_____

[3] That said, I would be remiss not to highlight that the viability of the *O' Shea* test has been called into question.  A plurality of our Supreme Court expressed doubt about the continued viability of the *O'Shea* test.  *See Commonwealth v. Hlubin*, 208 A.3d 1032, 1049-50 (Pa. 2019) (plurality) (superseded by statute on other grounds).  Indeed, in *Hobel*, this Court noted that several of our Supreme Court justices indicated their opposition in *Hlubin* to the continued application of *O'Shea*; however, three justices declined to address the validity of *O'Shea*; and one supported its application.  *See Hobel*, 275 A.3d at 1058 n.5.  Accordingly, *O'Shea* "remains good law." *Id*.

of intrusiveness"). Here, Chief Sharp's stop of Eakin resulted in a subsequent call to another officer, *i.e.*, Sergeant Heller, **another Polk borough officer**, who, after arriving, transported Eakin to the hospital for blood testing and a subsequent arrest. As in **Hlubin**, the level of intrusiveness resulting from this stop was high. Accordingly, the first prong of the **O'Shea** test favors Eakin and suppression. **Accord** Maj. Op. at 1 (similarly concluding the first prong favors suppression).

The second prong of the **O'Shea** test requires consideration of "the extent of deviation from the letter and spirit of the MPJA." **Hlubin**, 208 A.3d at 1048 (plurality). Our Supreme Court has observed that when officers regularly leave their primary jurisdiction to police in other jurisdictions, "jurisdictional lines are not maintained but rather are obliterated. Moreover . . . where this extraterritorial activity has no advance legislative approval or legal oversight, there is plainly no accountability to local authority." **Id**. Putting the validity of **O'Shea** aside, in **Hlubin**, the majority of our Supreme Court held that the MPJA is specifically limited to six enumerated exceptions when an officer exercises police power outside of his primary jurisdiction. **Id**. at 1052 (majority) (emphasis in original).[4] The Court held, "[b]ased upon the

---

[4] Here, the Majority relies heavily on **Commonwealth v. Lehman**, 870 A.2d 818, 820 (Pa. 2005). **Lehman,** however, is completely distinguishable from this case. First and foremost, in **Lehman**, the Court's analysis was based solely on the Commonwealth's argument that exception (a)(5) of the MPJA
*(Footnote Continued Next Page)*

*clear language* of these provisions of the MPJA and our conclusion that no exception . . . applied here," suppression was the appropriate remedy. *Id*. (emphasis added).[5]

Here, as in *Hlubin*, the MPJA's six exceptions did not apply for purposes of our review. Yet the Majority, in applying and analyzing the second *O'Shea* factor—applied only where the MPJA is violated—cites to section (a)(5) of the MPJA in its analysis. It is beyond cavil that where there is extraterritorial policing without an ICA in place, this Court looks to the MPJA to determine whether an exception applies. If an exception to the MPJA does *not* apply, then this Court proceeds to an *O'Shea* analysis. The learned Majority concedes no MPJA exceptions apply, applies *O'Shea*, and then frames the analysis based on an MPJA exception that the Commonwealth never asserted. *See* Maj. Op. at 11. This Court should acknowledge that no MPJA exceptions apply, and, therefore, notwithstanding Chief Sharp's good faith belief, Polk

---

applied. Here, an MPJA violation was conceded, and no exception thereto was argued or analyzed. Maj. Op. at 8. Also, nowhere in the *Lehman* opinion is there a reliance, application or even mention of the *O'Shea* test; the opinion is conspicuously devoid of any mention of *O'Shea*. Here, the application of *O'Shea* is the sole issue. Finally, in *Lehman* there is no argument made regarding the existence of an ICA agreement between the departments, an issue that features prominently in this matter.

[5] Our Supreme Court has recently reiterated that it is this Court's "main function" to "maintain and effectuate the decisional law of this Court as faithfully as possible." *N.W.M. Through J.M. v. Langenbach*, 316 A.3d 7, 22 (Pa. 2024) (internal quotations and footnote omitted).

Police Department's routine provision of police services outside of its primary jurisdiction, *i.e.*, in Frenchcreek Township, was unauthorized at the time under the ICA, and without an applicable MPJA exception.

This is of course not to say that every MPJA violation requires this Court to conclude that the second prong of the **O'Shea** test militates in favor of suppression. **See**, **e.g.**, **Commonwealth v. Kitcey**, 305 A.3d 974 (Pa. Super. 2023) (unpublished memorandum at *7) (concluding that while the MPJA authorized the police conduct at issue, even if there were no applicable MPJA exceptions, the second **O'Shea** factor would militate against suppression because the officer "obtained probable cause in his jurisdiction, and pursued [the defendant] based on . . . evidence [obtained in his primary jurisdiction]; and he therefore did not travel outside of his jurisdiction to acquire additional evidence").[6] **See also Hobel**, 275 A.3d at 1062-64 (in which this Court concluded that the MPJA's (a)(5) exception applied, but even if it did not, the second **O'Shea** factor did not favor suppression because the officer **while in his primary jurisdiction** observed a vehicle fitting a BOLO description and followed it into a neighboring jurisdiction, after which, on his return to his primary jurisdiction, he observed the defendant's vehicle back out of an abandoned road, drive through a stop sign, and accelerate away while swerving back and forth across the road). In contrast, here, Chief Sharp was

---

[6] **See** Pa.R.A.P. 126(b) (permitting citation to non-precedential decisions of this Court filed after May 1, 2019)

not in his primary jurisdiction nor performing functions related to his official business in his primary jurisdiction when grounds to stop Eakin arose. Therefore, the second **O'Shea** factor favors Eakin. **See Hlubin**, 208 A.3d at 1052.

The final **O'Shea** factor concerns the prejudice to the accused, *i.e.*, consideration of "whether the search would not have otherwise occurred or would not have been as intrusive" absent the violation. **Id**. (quoting **O'Shea**, 567 A.2d at 1030). Where the record contains no evidence upon which this Court can determine whether the stop would have occurred at all absent the extraterritorial policing, this factor weighs in favor of suppression. **See Hlubin**, 208 A.3d at 1049. Even in **Hobel**, the suppression court concluded, and this Court found its analysis persuasive that, assuming *arguendo* an MPJA violation, the third factor weighed in favor of Hobel where "**[t]here is no evidence this search was inevitable, and [Hobel] may have gone for a longer period without discovery had [the officer] not been present outside his primary jurisdiction**." 275 A.3d at 1064 (emphasis added; some brackets in original).[7] **But cf**. **Kitcey**, 305 A.3d 974 (unpublished memorandum at *7) (concluding the final **O'Shea** factor weighed against

_____

[7] In **Hobel**, a second officer joined a dragnet and "was not the first or sole pursuer," and other police departments were "monitoring the status of the pursuit," and, therefore, regarding that specific officer, the third **O'Shea** factor weighed against suppression because, based on the evidence of record, Hobel would have been stopped by other departments involved in the pursuit.

suppression because the officer, who witnessed a traffic violation in his primary jurisdiction, "called for backup and informed dispatch" of the extraterritorial stop as he activated his lights, and right after he conducted the stop, an officer from the primary jurisdiction arrived).

Here, Chief Sharp testified that he stopped Eakin following his observation of Eakin traveling for a half mile on the wrong side of the road. *See* N.T., 8/27/21, at 45. The record is devoid of evidence that, absent Chief Sharp's unauthorized presence, this stop would have occurred, and, accordingly, no indication that Eakin would have been stopped. The third *O'Shea* prong thus favors Eakin. *See Hlubin*, 208 A.3d at 1049; *Hobel*, 275 A.3d at 1064; *Kitcey*, 305 A.3d 974 (unpublished memorandum at *7). While the Majority speculates that any officer conducting the stop would have followed the same procedure as Chief Sharp, the Majority overlooks the fact that there is no evidence of record that a legal stop was likely to occur absent Chief Sharp's unauthorized stop. *See* Maj. Op. at 12. The only officers involved in this stop were from Polk Borough, and there was no testimony that a citizen/civilian witnessed the driving at issue. Speculation about the procedures of a hypothetical stop, without any additional evidence that the stop would have even likely occurred or been similarly intrusive shows ample prejudice under the third *O'Shea* factor and favors Eakin.

Accordingly, following application of **O'Shea**, I would conclude that all three factors militate in favor of suppression, and, thus, that the trial court committed no error in suppressing the evidence derived from the stop.

For the foregoing reasons, I respectfully dissent.

President Judge Lazarus and Judge McLaughlin join this dissenting opinion.