J-S58026-18

2018 PA Super 280

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| SARAH JEANNE BERGAMASCO | : | No. 471 WDA 2018 |

Appeal from the Order February 28, 2018
In the Court of Common Pleas of Westmoreland County Criminal Division
at No(s):  CP-65-CR-0002598-2017

BEFORE:  OLSON, J., MURRAY, J., and FORD ELLIOTT, P.J.E.

OPINION BY MURRAY, J.:                    **FILED OCTOBER 16, 2018**

The Commonwealth of Pennsylvania (Commonwealth) appeals from the order granting Sarah Jeanne Bergamasco's (Appellee) suppression motion. We affirm.

After Appellee's suppression hearing, the trial court made the following findings of fact:

> 1.  On October 30, 2016, Officer Kenneth Burke ("Officer Burke") was employed by Ligonier P.D. and working an 11:00 p.m. to 3:00 a.m. DUI Task Force shift, at the tail end of which Officer Burke transported a DUI arrestee to Latrobe Hospital for a blood draw. (Omnibus Pretrial Mot. Hr'g Tr. 5, 11, Jan. 18, 2018).
>
> 2.  Following the blood draw, at approximately 3:30 a.m., on his return to Ligonier Borough from Latrobe Hospital, but while still within the boundaries of the City of Latrobe, Officer Burke stopped his patrol vehicle at a red traffic light on Ligonier Street and observed [Appellee]'s vehicle across the intersection headed in the opposite direction on Ligonier Street in the left-hand turning lane with its left turn signal on.  (Id. at 6, 11).
>
> 3.  When the traffic light turned green, Officer Burke proceeded to enter the intersection while [Appellee]'s vehicle also traveled into

the intersection to commence a left-hand turn that would take her across Officer Burke's traffic lane; Officer Burke had the right-of-way. (Id. at 6).

4. Officer Burke testified that [Appellee] did not yield the right-of-way, tried to make the left-hand turn, and "almost hit the [driver's] side" of his marked patrol car. (Id. at 6, 13).

5. Officer Burke testified that "to get [Appellee's] vehicle to stop from hitting [him]," he activated his patrol car's bar lights and stopped his vehicle in the "middle of the intersection." (Id. at 6, 9).

6. In response to Officer Burke stopping his patrol car and activating his lights, [Appellee] stopped her vehicle immediately, without swerving, and when both cars were stopped, the front left of [Appellee]'s vehicle was "pretty close" to Officer Burke's patrol car, such that when both drivers rolled down their windows they were looking directly at one another, *i.e.*, driver-side window to driver-side window. (Id. at 13).

7. Officer Burke testified that while still seated in his patrol car, "upon rolling down the window, [he] could tell that [Appellee] appeared to be intoxicated by looking at her. Her eyes were real glassed over. Her cheeks were kind of red. She kind of had a very blank stare." (Id. at 7).

8. Officer Burke testified that he then got out of his patrol car to "see if she was, in fact, impaired," at which point he asked [Appellee] if she had anything to drink and she responded that she had three (3) or four (4) drinks. (Id. at 7-8).

9. Given the positions of the vehicles upon stopping, as set forth in paragraph 6 above, the [c]ourt finds that the front left of [Appellee]'s vehicle must have been positioned near the rear of Officer Burke's patrol car, such that Officer Burke was able to look directly at [Appellee], ask her "what she was doing," and observe her eyes and face while both parties were still seated in their drivers' seats, and Officer Burke was able to open his door and exit his patrol car without using a passenger door. (Id. at 7).

10. After getting out of his vehicle and asking [Appellee] if she had anything to drink, Officer Burke told [Appellee] not to drive away or go anywhere. (Id. at 8). Officer Burke then got back into

his patrol car, radioed the Latrobe Police Department, and remained in his vehicle in the middle of the intersection until local Latrobe P.D. arrived on the scene a couple minutes later. (Id. at 8-9).

11. When Latrobe P.D. Officer Keslar arrived on the scene, Officer Burke told Officer Keslar that [Appellee] admitted to drinking a "couple beers or . . . drinks." (Id. at 9). Officer Burke then returned to Ligonier and Officer Keslar completed the arrest, administering field sobriety tests and a breathalyzer test on scene. (Id. at 15).

Trial Court Opinion, 2/28/18, at 4-5.

Appellee was charged with driving under the influence of alcohol (DUI) – general impairment, and DUI – high rate of alcohol.[1] On August 10, 2017, Appellee filed an omnibus pretrial motion to suppress in which she argued that the traffic stop in Latrobe by a Ligonier police officer was unlawful under Pennsylvania's Municipal Police Jurisdiction Act (MPJA), 42 Pa.C.S.A. § 8951, *et seq.*, and the Fourth Amendment of the United States Constitution and Article I, § 8 of the Pennsylvania Constitution. On January 18, 2018, the trial court held a hearing on Appellee's suppression motion, during which Officer Burke, who initiated the traffic stop, testified.

On February 28, 2018, the trial court granted Appellee's suppression motion, concluding that Officer Burke's traffic stop of Appellee violated the MPJA. On March 28, 2018, the Commonwealth timely appealed to this Court, certifying that the trial court's decision to grant Appellee's suppression motion

_____

[1] 75 Pa.C.S.A. § 3802(a)(1), (b).

- 3 -

substantially handicapped the prosecution. ***See*** Pa.R.A.P. 311(d) (permitting the Commonwealth to appeal from an interlocutory order if it certifies that the order will terminate or substantially handicap the prosecution). Both the trial court and the Commonwealth have complied with Rule 1925 of the Pennsylvania Rules of Appellate procedure.

On appeal, the Commonwealth presents the following issue for review:

> Did the trial court err in suppressing the traffic stop of [A]ppellee's vehicle and all evidence gained thereafter, finding that the police officer violated the Pennsylvania Municipal Police Jurisdiction Act?

Commonwealth Brief at 3.

Our standard of review in addressing a challenge to the trial court's granting of a suppression motion is well settled:

> When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.

***Commonwealth v. Korn***, 139 A.3d 249, 252-53 (Pa. Super. 2016) (quoting ***Commonwealth v. Miller***, 56 A.3d 1276, 1278-79 (Pa. Super. 2012)). "Our standard of review is restricted to establishing whether the record supports the suppression court's factual findings; however, we maintain *de novo* review over the suppression court's legal conclusions." ***Commonwealth v. Brown***, 996 A.2d 473, 476 (Pa. 2010).

The MPJA provides police with the authority to act as police officers outside their jurisdiction in limited circumstances. ***Commonwealth v. Lehman***, 870 A.2d 818, 820 (Pa. 2005). One of the principal purposes of the MPJA is to promote public safety, while maintaining police accountability to local authority. ***Commonwealth v. Merchant***, 595 A.2d 1135, 1138 (Pa. 1991). Our Courts have explained that the MPJA must be construed liberally to achieve one of its purposes, which is to provide police with the authority to act outside their jurisdictions under the circumstances enumerated in that Act. ***Commonwealth v. Chernosky***, 874 A.2d 123 (Pa.Super.2005) (*en banc*).

The pertinent provision of the MPJA states:

**(a) General rule.--**Any duly employed municipal police officer who is within this Commonwealth, but beyond the territorial limits of his primary jurisdiction, shall have the power and authority to enforce the laws of this Commonwealth or otherwise perform the functions of that office as if enforcing those laws or performing those functions within the territorial limits of his primary jurisdiction in the following cases:

\*      \*      \*

(5) Where the officer is on official business and views an offense, or has probable cause to believe that an offense has been committed, and makes a reasonable effort to identify himself as a police officer and which offense is a felony, misdemeanor, breach of the peace or other act which presents an immediate clear and present danger to persons or property.

42 Pa.C.S.A. § 8953(a)(5).

[S]ection 8953(a)(5) of the MPJA authorizes an extrajurisdictional detention where the detaining officer is on-duty, outside his or her jurisdiction for a routine or customary reason including responding to an exigent circumstance, develops probable cause to believe an offense has been committed, and limits out-of-jurisdiction

- 5 -

activities to maintaining the status quo, including detaining the suspect, until officers from the appropriate jurisdiction arrive.

***Commonwealth v. Lehman***, 870 A.2d 818, 821 (Pa. 2005).  Probable cause for an arrest exists where the facts and circumstances within the officers' knowledge are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed.  ***Commonwealth v. Stultz***, 114 A.3d 865, 883 (Pa. Super. 2015) (quotations and citations omitted).

The Commonwealth first argues that Officer Burke did not violate the MPJA when he stopped Appellee because she was an immediate clear and present danger to persons or property.  The trial court determined that Appellee was not an immediate clear and present danger for the following reasons:

12.  Aside from asserting that [Appellee] did not yield the right-of-way, Officer Burke did not observe [Appellee] driving erratically, or in any other manner indicating that she was driving under the influence of alcohol or a controlled substance, either before or after approaching the intersection.  (Id. at 12-13).

13.  At the Omnibus hearing, the Commonwealth introduced no evidence regarding the dimensions of the intersection, or how fast either car was moving in the intersection during this encounter.  However, based upon Officer Burke's testimony, the Court finds that neither Officer Burke nor [Appellee] were traveling at a speed capable of causing an accident that would result in physical injuries to the vehicles' occupants as both Officer Burke and [Appellee]'s vehicles stopped without any extraordinary measures being noted, *i.e.*, Officer Burke did not testify that he or [Appellee] swerved, slammed on their brakes, skid, or were otherwise not in control of their vehicles.

14.  Based upon the totality of Officer Burke's testimony, and particularly given the above finding of the final positions of the parties' vehicles relative to one another, the [c]ourt finds it more

likely than not that [Appellee]'s vehicle would have turned left behind Officer Burke's patrol car had he not stopped in the intersection.

15. As [Appellee] stopped her vehicle in the intersection in response to Officer Burke unexpectedly stopping his patrol car in the middle of the intersection while activating his warning lights, the [c]ourt finds that [Appellant] had her vehicle under control, and thus, no actual danger to persons or property was present.

16. Officer Burke's traffic stop of [Appellee] occurred when Officer Burke turned on his warning lights and stopped his car in the middle of the intersection.

Trial Court Opinion, 2/28/18, at 5.

The Commonwealth argues that this case is analogous to **Merchant**. The Commonwealth asserts that **Merchant** stands for the proposition that failing to yield the right-of-way demonstrates an immediate clear and present danger to persons and property.

In **Merchant**, two Borough of Etna police officers, as part of their usual routine, were traveling through the Borough of Aspinwall when they observed Merchant "driving in a very erratic manner crossing the double yellow lines; in fact, almost hitting a vehicle coming in the opposite direction head on." **Id.** at 1135. Based on their observations, the officers conducted a traffic stop of Merchant and called the Aspinwall Police. **Id**. at 1135-36.

Our Supreme Court concluded that "the actions of the Etna police officers in stopping and detaining appellee were authorized under section (a)(5) of the statute." **Id.** at 1139. The Court explained,

Firstly, the officers were on "official business" in that they were on duty travelling their usual route as part of their routine

responsibilities. Secondly, when appellee drove his car in an erratic manner almost hitting an oncoming car, probable cause was established that an offense had been committed "which offense [was] a felony, misdemeanor, breach of the peace or other act which present[ed] an immediate clear and present danger to persons or property." Thirdly, the police, in uniform and a marked car, identified themselves as police officers. Finally, the officers limited the impact of their activities outside their primary jurisdiction by merely detaining appellee while awaiting the arrival of the Aspinwall Township police.

*Id.*

Instantly, we conclude that the trial court did not err in determining that Appellee did not present an immediate clear and present danger to persons and property. Officer Burke's testimony reflects that when he arrived at the intersection, he observed Appellee's vehicle directly across from him, "stopped in the left-hand turning lane with a turn signal on waiting to go left." N.T., 1/18/18, at 6. When the light turned green, both vehicles proceeded into the intersection. *Id.* Officer Burke stated that he believed that Appellee was not going to yield the right-of-way and was about to make a left turn into his patrol car. *Id.* The trial court, however, made the factual finding that had Officer Burke not suddenly stopped his vehicle and activated his lights, Appellee would have proceeded to safely make a left turn. Trial Court Opinion, 2/28/18, at 4-5. The record supports this conclusion. The record reveals that when both cars were stopped, the two vehicles were positioned such that both drivers were looking directly at one another out of their driver's side windows (*i.e.*, the record reflects that Appellee's vehicle did not turn left while cutting

- 8 -

in front of Officer's Burke patrol car).  N.T., 1/18/18, at 13; ***see also*** Trial Court Opinion, 2/28/18, at 4-5.

Therefore, this case is distinguishable from ***Merchant***, because there is no evidence that Appellee's driving posed an immediate clear and present danger to persons and property, unlike the observations of the police officers in ***Merchant***; likewise, Officer Burke did not have probable cause to conduct a traffic stop of Appellee for failing to yield the right of way.  Here, there is no evidence that Appellee was driving erratically, that she crossed the center line numerous times, or that she almost hit oncoming vehicles.  Indeed, the trial court found it significant that there was no evidence that Appellee was driving erratically.  Trial Court Opinion, 2/28/18, at 5.  Instead, the record reflects that Appellee appropriately stopped at a red light, activated her signal for a left-hand turn, and proceeded to the intersection to make a left turn when the light turned green.  Appellee proceeded into the intersection without turning in front of or into Officer Burke's patrol car.  Accordingly, we conclude that the trial court did not abuse its discretion in concluding that Appellee did not present an immediate clear and present danger and therefore, that Officer Burke violated the MPJA in stopping Appellee's vehicle.

Next, the Commonwealth argues that even if Officer Burke violated the MPJA, suppression was not the appropriate remedy.  The Commonwealth asserts that Officer Burke acted to prevent a public safety concern and that

Appellee never "articulate[d] that she suffered any prejudice." Commonwealth's Brief at 23.

In support of this claim, the Commonwealth relies on this Court's decision in ***Commonwealth v. Henry***, 943 A.2d 967 (Pa. Super. 2008). In ***Henry***, we explained:

> Two conflicting positions have arisen in this Court on the question as to whether a violation of the MPJA entitles an aggrieved party to suppression under the exclusionary rule. In ***Commonwealth v. Bradley***, 724 A.2d 351 (Pa. Super. 1999) (*en banc*), this Court noted the exclusionary rule applies to any evidence gathered subsequent to an MPJA violation "even if the officer acts in good faith or the police officer's actions would have been lawful if performed within the proper jurisdictional limits." ***Id.*** at 354.
>
> In ***Commonwealth v. Chernosky***, 874 A.2d 123 (Pa. Super. 2005) (*en banc*), [] this Court implicitly rejected the absolutist approach espoused in ***Bradley*** in favor of the case-by-case approach approved of by our Supreme Court in ***Commonwealth v. O'Shea***, 567 A.2d 1023 ([Pa.] 1990). The factors to be considered in applying this case-by-case approach consist of "all the circumstances of the case including the intrusiveness of the police conduct, the extent of deviation from the letter and spirit of the [MPJA], and the prejudice to the accused." ***Chernosky***, *supra* at 130, quoting ***O'Shea***, *supra* at 1030. The ***Chernosky*** Court further noted that the spirit, or purpose of, the MPJA "is to proscribe investigatory, extraterritorial forays used to acquire additional evidence where probable cause does not yet exist." ***Id***.
>
> ***Chernosky*** unquestionably sets forth the proper standard this Court is to employ in determining whether the exclusionary rule should act to suppress evidence obtained pursuant to an MPJA violation. ***Chernosky*** relies on an approach approved by our Supreme Court, is more recent than the decision rendered in ***Bradley***, and sets forth a standard which allows this Commonwealth's courts to tailor a remedy in situations where police intentionally have overstepped their boundaries while still affording our courts the flexibility to deny suppression when police

- 10 -

have acted to uphold the rule of law in good faith but are in technical violation of the MPJA.

*Id.* at 971-72 (some citations omitted).

With respect to **Henry**, the trial court explained:

In the present case, this [c]ourt . . . found that Officer Burke's conduct in unexpectedly stopping in the middle of the intersection, thereby seizing and detaining [Appellee], was significantly intrusive, substantially deviated from the letter and spirit of the MPJA, and was substantially prejudicial to [Appellee]. In Pennsylvania, as distinct from its federal counterpart, the exclusionary rule serves "other values besides deterrence; it also vindicates an individuals right to privacy." [**Commonwealth**] **v. Johnson**, 86 A.3d 182, 188 (Pa. 2014). As such, "[f]rom the perspective of the citizen whose rights are at stake, an invasion of privacy, in good faith or bad, is equally as intrusive." [**Commonwealth**] **v. Edmunds**, 586 A.2d 887, 901 (Pa. 1991). Regarding the MPJA, its principle object is "the promotion of public safety while maintaining jurisdictional police lines," which "in turn fosters local control over police, and discourages extra-territorial forays by outside law enforcement officers who are not subject to the control of the municipality." **Merchant**, 595 A.2d at 1138, n.7.

The privacy rights of the individual, police accountability to local authority, and the Commonwealth's interest in public safety can and must be protected. Based on the evidence presented, Officer Burke was not out of his jurisdiction and presented with "an immediate clear and present danger to persons or property." Instead, he was out of his jurisdiction, not subject to the local authority thereof, and contributed to the creation of the risk of an accident, where otherwise[,] this [c]ourt found [Appellee] would likely have passed safely behind him. On that basis, this [c]ourt finds that the cause and manner of [Appellee]'s seizure was insufficient and unreasonable under the Fourth Amendment and Article I, § 8. Consequently, . . . the seizure of [Appellee] was not merely a technical violation of the MPJA, but rather was a significant intrusion upon her safety and constitutionally protected privacy, was a substantial deviation from the MPJA's "ultimate goal of maintaining police accountability to local authority," and unlawfully produced evidence substantially prejudicial to her. **Merchant**, 595 A.2d at 1139. Therefore, this [c]ourt found that

application of the exclusionary rule was warranted under the MPJA[.]

Trial Court Opinion, 5/22/18, at 4-5.

Based on our review of the certified record and the applicable case law, we agree with the trial court's resolution of this issue. The record reflects that Officer Burke, while outside of his jurisdiction, conducted a traffic stop where Appellee did not present an immediate clear and present danger to persons or property and where he did not otherwise have probable cause to do so. Therefore, we conclude that the trial court did not abuse its discretion in determining that application of the exclusionary rule was appropriate based on Officer Burke's violation of the MPJA and the intrusion on Appellee's constitutional rights.

Order affirmed.

P.J.E. Ford Elliott joins the Opinion.

Judge Olson concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/16/2018

- 12 -