J-A18040-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ISHEMER DWAYNE RAMSEY | : | |
| | : | |
| Appellant | : | No. 896 WDA 2020 |

Appeal from the Judgment of Sentence Entered December 2, 2019
In the Court of Common Pleas of Butler County Criminal Division at
No(s): CP-10-CR-0001618-2017

BEFORE: OLSON, J., NICHOLS, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.: **FILED: NOVEMBER 16, 2021**

Ishemer Dwayne Ramsey ("Ramsey") appeals from the judgment of sentence entered following his convictions of first-degree murder, abuse of corpse, tampering with evidence, conspiracy to commit abuse of corpse, and conspiracy to tamper with evidence.[1] We affirm.

On June 8, 2017, Ramsey shot and killed his girlfriend, Melissa Barto ("Barto"), while they were sitting in Ramsey's car. After shooting Barto, Ramsey hid her body in a wooded area in Butler County, Pennsylvania. Ramsey then drove to Butler City, where he met with an acquaintance, James Howard-George ("Howard-George"). Ramsey told Howard-George that he had shot Barto and needed Howard-George's help in disposing of the body. Ramsey and Howard-George then drove to a carwash in Butler Township,

_____

[1] 18 Pa.C.S.A. §§ 2501(a), 5510, 4910(1), 903.

where they cleaned the interior of the vehicle, and drove a different vehicle to a Walmart in Butler Township. At Walmart, they purchased rope, bleach, and a tarp. Ramsey and Howard-George then retrieved Barto's body, and drove with it to a secluded area in Lawrence County. When they arrived, Ramsey and Howard-George used an accelerant to burn the body and hide it a second time.

The next day, Barto's mother contacted the Butler City Police Department ("BCPD") to report Barto missing, as Barto had failed to attend her daughter's kindergarten graduation. The BCPD opened an investigation, during which Ramsey and Howard-George were indicated as persons of interest, as Ramsey and Barto were described by Barto's friends as having a tumultuous relationship. During the investigation, the BCPD obtained surveillance video of Ramsey and Howard-George cleaning the passenger area of Ramsey's vehicle at the carwash, and Ramsey and Howard-George purchasing materials at Walmart. The BCPD also informed nearby jurisdictions, including the Butler Township Police Department ("BTPD"), that they were searching for Ramsey and wanted to question him regarding Barto's disappearance.

On June 10, 2017, officers with the BTPD observed Ramsey driving his vehicle in Butler Township. Officers followed Ramsey to a residence in Connoquenessing Township (the "Eagle Mill Road Address"), which was owned by acquaintances of Ramsey, and informed BCPD officers that they had

located Ramsey.[2]   Officers also observed that Ramsey was carrying a handgun, and asked Ramsey to give it to the owners of the residence for safekeeping.  BCPD officers then arrived at the scene, handcuffed Ramsey, and took him into custody.  On the same day, BCPD officers located Howard-George, who reported that Ramsey had confessed to shooting Barto during an argument, and admitted that he had helped Ramsey clean the vehicle.  The next day, BTPD officers returned to the residence to take possession of Ramsey's handgun and prepare Ramsey's vehicle for towing, during which officers observed a strong odor of bleach from the vehicle, and noticed that the front passenger seat and carpeting were missing.

On June 12, 2017, a farmer in Lawrence County discovered Barto's burnt remains, and responding officers located items near the body consistent with those purchased by Ramsey and Howard-George at Walmart.  A later autopsy revealed that Barto had died from a gunshot wound to the head, and that the burning took place after her death.  On June 15, 2017, the Pennsylvania State Police executed a search warrant related, *inter alia*, to items found during the BTPD's encounter with Ramsey at the Eagle Mill Road Address.

Subsequently, Ramsey was charged with multiple offenses related to the homicide.  Ramsey filed an Omnibus Pretrial Motion seeking, *inter alia*, to

---

[2] Connoquenessing Township utilizes the Pennsylvania State Police for its police services.  It does not employ a municipal police force, and it is not a party to any agreement with a neighboring municipality for police services.

suppress the vehicle and handgun seized the day after Ramsey's arrest at the Eagle Mill Road Address, because the BTPD violated the Municipal Police Jurisdiction Act ("MPJA").[3] Following two hearings, the trial court granted in part and denied in part the Omnibus Motion, specifically denying Ramsey's Motion to suppress the evidence seized the day after Ramsey's arrest.

Following a non-jury trial, the trial court convicted Ramsey of the above-referenced offenses. On December 2, 2019, the trial court sentenced Ramsey to life in prison for the murder conviction, and consecutive sentences of 12 to 24 months in prison for each of the abuse of corpse and tampering with evidence convictions. Ramsey filed timely post-sentence Motions, in which he raised, *inter alia*, claims related to sufficiency and weight of the evidence underlying his murder conviction, and claims related to prosecutorial misconduct. The trial court denied Ramsey's Motions after argument. Ramsey thereafter filed a timely Notice of Appeal and a court-ordered Pa.R.A.P. 1925(b) Concise Statement of matters complained of on appeal.

Ramsey raises the following questions for our review:

I. Did the [trial] court err in denying [Ramsey]'s Motion to Suppress evidence where it was obtained in violation of the [MPJA], and in holding that the [i]ndependent [s]ource [d]octrine served to permit admission of evidence where suppression would have otherwise been required?

II. Did the [trial] court err in finding [Ramsey] guilty of first-degree homicide, where the Commonwealth failed to sufficiently

---

[3] 42 Pa.C.S.A. §§ 8951-8954.

- 4 -

establish malice or intent, and where a finding of guilt as to first-degree homicide was against the weight of the evidence?

III. Did the [trial] court err in rending a verdict only as to first-degree homicide[,] and not entering a verdict relative to voluntary manslaughter, involuntary manslaughter, or third-degree homicide, when arguments and requests for such verdicts were presented by defense counsel?

IV. Did the [trial] court err in denying [Ramsey]'s [p]ost [s]entence Motion for a new trial based upon pervasive prosecutorial misconduct amounting to a violation of [Ramsey]'s due process rights?

Brief for Appellant at 9.

First, Ramsey argues that the suppression court erred in denying his Motion to Suppress evidence seized from the Eagle Mill Road Address because the evidence was seized in violation of the MPJA. *Id.* at 19-33. Ramsey asserts that neither the BTPD nor the BCPD's actions were justifiable under the exceptions provided for in the MPJA. *Id.* at 24-25. Ramsey claims that both departments' conduct was contrary to the MPJA's stated purpose in preventing investigatory extraterritorial forays used to acquire evidence without probable cause. *Id.* at 25. Ramsey also argues that the independent source doctrine does not apply to the seizures at issue, as the Pennsylvania State Police's subsequent search warrant was not "truly independent" from the seizures at the Eagle Mill Road Address. *Id.* at 27-30. Finally, Ramsey asserts that the proper remedy for the MPJA violations is suppression, as the departments at issue acted in bad faith. *Id.* at 31-33.

We conduct our review according to the following standard:

Our standard of review in addressing a challenge to a [suppression] court's denial of a suppression motion is limited to determining whether its factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Since the prosecution prevailed in the suppression court, we may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the [suppression] court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

**Commonwealth v. Blair**, 860 A.2d 567, 571 (Pa. Super. 2004) (quoting

**Commonwealth v. Bomar**, 826 A.2d 831, 842 (Pa. 2003)).

The MPJA defines the primary territorial jurisdiction of municipal police officers as "[t]he geographical area within the territorial limits of a municipality or any lawful combination of municipalities which employs a municipal police officer." 42 Pa.C.S.A. § 8951. Section 8953(a) of the MPJA authorizes six instances in which municipal police officers may legitimately conduct an arrest outside of their primary jurisdiction, which includes the following: "Where the officer … has been requested to aid or assist a Federal, State or local law enforcement officer or park police officer…." **Id.** § 8953(a)(3)(i).

It is well-settled that:

[T]he MPJA must be liberally construed to effectuate the purposes of the Act, which include providing police with the authority to act in a law enforcement capacity outside their own jurisdictions under limited circumstances. The intent behind the MPJA is to promote public safety while maintaining police accountability; the Act was not intended to be used to erect impenetrable jurisdictional walls benefiting only criminals hidden in their shadows.

Two conflicting positions have arisen in this Court on the question as to whether a violation of the MPJA entitles an aggrieved party to suppression under the exclusionary rule. In **Commonwealth v. Bradley**, 724 A.2d 351 (Pa. Super. 1999) (*en banc*), this Court noted the exclusionary rule applies to any evidence gathered subsequent to an MPJA violation even if the officer acts in good faith or the police officer's actions would have been lawful if performed within the proper jurisdictional limits.

In **Commonwealth v. Chernosky**, 874 A.2d 123 (Pa. Super. 2005) (*en banc*), **appeal denied**[,] … 902 A.2d 1238 ([Pa. ]2006), this Court implicitly rejected the absolutist approach espoused in **Bradley** in favor of the case-by-case approach approved of by our Supreme Court in **Commonwealth v. O'Shea**, … 567 A.2d 1023 ([Pa. ]1990). The factors to be considered in applying this case-by-case approach consist of all the circumstances of the case including the intrusiveness of the police conduct, the extent of deviation from the letter and spirit of the [MPJA], and the prejudice to the accused. [**See**] **Chernosky**, **supra** at 130. The **Chernosky** Court further noted that the spirit, or purpose of, the MPJA is to proscribe investigatory, extraterritorial forays used to acquire additional evidence where probable cause does not yet exist.

**Chernosky** unquestionably sets forth the proper standard this Court is to employ in determining whether the exclusionary rule should act to suppress evidence obtained pursuant to an MPJA violation. **Chernosky** relies on an approach approved by our Supreme Court, is more recent than the decision rendered in **Bradley**, and sets forth a standard which allows this Commonwealth's courts to tailor a remedy in situations where police intentionally have overstepped their boundaries while still affording our courts the flexibility to deny suppression when police have acted to uphold the rule of law in good faith but are in technical violation of the MPJA.

**Commonwealth v. Henry**, 943 A.2d 967, 971-72 (Pa. Super. 2008), **appeal denied**, 959 A.2d 928 (Pa. 2008) (quotation marks and most citations omitted); **see also O'Shea**, 567 A.2d at 1030, **cert. denied**, 498 U.S. 881 (1990) (holding that "suppression of evidence may or may not be the

appropriate remedy for a violation of [MPJA]"); ***Commonwealth v. Borovichka***, 18 A.3d 1242, 1250 (Pa. Super. 2011) (concluding that suppression for violation of MPJA was not warranted where it would "run afoul of the legislative intent behind the MPJA, which is to promote public safety, not to hinder law enforcement and shield criminal behavior.") (citations omitted).[4]

As an initial matter, we discern no abuse of discretion in the suppression court's conclusion that the BTPD's actions were justified pursuant to the exception set forth in section 8953(a)(3)(i), as the BTPD had been specifically requested by the BCPD, a local law enforcement agency, to assist in locating Ramsey as part of their investigation into Barto's disappearance and potential murder. N.T. (Suppression Hearing), 11/24/18, at 65-66, 85 (wherein BTPD Officer Max Wittlinger testified that the BTPD had received a request for

_____

[4] This Court recognizes our Supreme Court's recent decision in ***Commonwealth v. Hlubin***, 208 A.3d 1032 (Pa. 2019) (plurality), which called into question the continued vitality of the ***O'Shea*** test. ***Hlubin***, 208 A.3d at 1049-51. However, we note that the portion of the ***Hlubin*** Court's Opinion that questioned the usage of the ***O'Shea*** test was only joined by a plurality of the Court. A footnote in the ***Hlubin*** decision argued that the ***O'Shea*** test had been effectually overruled, based on the Supreme Court's failure to apply the test in ***Commonwealth v. McCandless***, 648 A.3d 1032 (Pa. 2019). ***Hlubin***, 208 A.3d at 1050 n.14. However, this Court, on multiple occasions since ***McCandless***, has applied the ***O'Shea*** test in matters arising under the MPJA, and our Supreme Court has never directly taken this issue up on appeal. ***See***, ***e.g.***, ***Commonwealth v. Bergamasco***, 197 A.3d 805, 813 (Pa. Super. 2018); ***see also Henry***, ***supra***, ***appeal denied***, ***supra*** (wherein this Court specifically endorsed the ***O'Shea*** test, after which our Supreme Court denied Henry's petition for allowance of appeal).

assistance from BCPD to locate Ramsey as a person of interest in Barto's disappearance). Accordingly, the suppression court properly ruled that the BTPD officers were not in violation of the MJPA when they contacted Ramsey at the Eagle Mill Road Address. **See** 42 Pa.C.S.A. § 8953(a)(3)(i).[5]

With regard to the BCPD's detention of Ramsey at the Eagle Mill Road Address, we discern no abuse of discretion by the suppression court in concluding that the BCPD's conduct did not fall within the limited exceptions provided for in section 8953 of the MPJA. **See** Suppression Court Opinion, 8/5/19, at 16-17. However, even if the BCPD were in technical violation of the MPJA, that does not end our analysis. **See Chernosky**, **supra**; **O'Shea**,

_____

[5] Further, regarding Ramsey's vehicle and handgun seized by the BTPD at the Eagle Mill Road Address, the legal owner of Ramsey's vehicle was Ramsey's father, who provided BTPD officers with the keys. N.T., 11/14/18, at 62 (wherein Ramsey's father testifies that he "probably" told police that they could take the vehicle after Ramsey was transported). Ramsey's firearm, which Ramsey provided to the homeowner prior to his detention, was given to BTPD officers with the homeowner's permission. **Id.** at 33 (wherein the owner of the Eagle Mill Road Address testified that Ramsey gave his handgun to the owner's husband to lock in their gun cabinet, and that her husband provided police with the handgun with the permission of Ramsey's father). **O'Shea**, 567 A.2d at 1030 (determining that officers operating outside of their jurisdiction did not violate the MPJA when they obtained the consent of the homeowner before searching the residence, as the Court "will not prohibit police officers from doing that which a private citizen could do.").

567 A.2d at 1030.[6]

In this case, the suppression court properly concluded that, at the time of Ramsey's detention at the Eagle Mill Road Address, BCPD officers possessed probable cause to believe that Ramsey had committed criminal homicide based upon information that they had received from Howard-George and Barto's friends; the report indicating that Ramsey and Howard-George were seen at the carwash cleaning Ramsey's vehicle and cutting carpet out of the vehicle with a knife; and their review of Walmart surveillance tape showing Ramsey and Howard-George purchasing rope, a tarp, and gloves. Suppression Court Opinion, 8/5/19, at 13-17; *see also Chernosky*, 874 A.2d at 130 (stating that the purpose of the MPJA "is to proscribe investigatory, extraterritorial forays used to acquire additional evidence *where probable cause does not yet exist*.") (emphasis added, citation omitted). Combined with the surveillance footage from the car wash, we note that when both departments arrived at the Eagle Mill Road Address, it was plainly visible that Ramsey's passenger seat was missing, and officers smelled the strong odor of

---

[6] Although the suppression court did not determine that the BCPD's detention of Ramsey satisfied the second prong of the *O'Shea* test, we may affirm the court's decision on any basis. *See Commonwealth v. O'Shea*, 567 A.2d at 1028 (concluding that "even if the suppression court did err in its legal conclusions, the reviewing court may nevertheless affirm its decision where there are other legitimate grounds for admissibility of the challenged evidence.").

bleach when they first approaching the vehicle when preparing it for towing. N.T., 11/14/18, at 126-27.

Because the BTPD possessed the authority to perform law enforcement duties at the Eagle Mill Road Address pursuant to section 8953(a)(3)(i), the BTPD properly could detain Ramsey. It would be contrary to the MPJA's intent to promote public safety to prohibit the BTPD from allowing the BCPD, as the primary agency investigating Barto's disappearance and, at that point, her suspected murder, to arrive at and detain the primary person of interest at the site of contact by the BTPD. Finally, the record reflects that the BTPD and BCPD worked in conjunction with one another throughout the investigation in their attempts to locate Ramsey, which culminated in the BTPD notifying BCPD that they had located Ramsey and were pursuing him, and providing the location where they eventually contacted him. BCPD officers responded within minutes of BTPD officers initially contacting Ramsey; officers from both departments were present for Ramsey's detention; and the departments collaborated regarding the subsequent possession of Ramsey's handgun and the vehicle. Additionally, the Pennsylvania State Police, who possessed primary jurisdiction in Connoquenessing Township, were asked by BCPD to assist in the investigation shortly after Ramsey's detention, including State Troopers interviewing Howard-George. *See* N.T., 6/24/19, at 81-91 (wherein Pennsylvania State Trooper Brian Knirnschild testified that the BCPD requested his assistance in the investigation into Barto's disappearance).

The record confirms that the events leading to Ramsey's detention at the Eagle Mill Road Address were the result of a unique, quickly-evolving situation involving multiple police departments across multiple jurisdictions. What initially began as a missing person investigation transformed into a homicide investigation while police from multiple jurisdictions were searching for Ramsey, as the last person to see Barto alive, and Howard-George, as a person seen with Ramsey on the night of Barto's disappearance. Despite Ramsey indicating to the BCPD that he would be out of the area for military training, BTPD officers observed his distinctive vehicle driving in Butler Township, and within minutes pulled in behind Ramsey at the Eagle Mill Road Address just over the Connoquenessing Township border. In light of the totality of the circumstances, we conclude that the BCPD's actions did not deviate from the "letter and spirit" of the MPJA, and as a result, suppression would constitute an inappropriate remedy. **See Henry**, **supra**; **O'Shea**, **supra**.

In Ramsey's second issue, he challenges the sufficiency and weight of the evidence. Regarding his sufficiency claim, Ramsey argues that the Commonwealth failed to establish the premeditation element of first-degree murder. Brief for Appellant at 35-36. Ramsey points to his consistent characterization of Barto's shooting as occurring in the heat of the moment during a fight, rather than a premeditated murder. **Id.** Ramsey also asserts,

on similar grounds, that the first-degree murder conviction was against the weight of the evidence. *Id.* at 37-41.[7]

When considering a challenge to the sufficiency of the evidence, we determine

> whether[,] viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder[,] unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, or part or none of the evidence.

*Commonwealth v. Melvin*, 103 A.3d 1, 39-40 (Pa. Super. 2014) (citation omitted).

_____

[7] Regarding Ramsey's weight claim, we note that Ramsey did not raise a challenge to the weight of the evidence in his Concise Statement, despite raising the issue in his post-sentence Motion. Accordingly, this claim is waived. *See* Pa.R.A.P. 1925(b)(4)(vii) (stating that issues not included in a Concise Statement are waived); *Commonwealth v. Bullock*, 948 A.2d 818, 823 (Pa. Super. 2008) (stating that an appellant waives any issue not raised in a court-ordered concise statement) (citing *Commonwealth v. Lord*, 719 A.2d 306, 308 (Pa. 1998)). Moreover, in its Opinion denying Ramsey's post-sentence Motion, the trial court ably and effectively addressed Ramsey's challenge to the weight of the evidence underlying his murder conviction. *See* Trial Court Memorandum Opinion, 8/5/20, at 3-5.

The Crimes Code provides that "[a] criminal homicide constitutes murder of the first degree when it is committed by an intentional killing." 18 Pa.C.S.A. § 2502(a). Our Supreme Court has stated that in order "[t]o convict a defendant of first[-]degree murder, the Commonwealth must prove: [(1)] a human being was unlawfully killed; [(2)] the defendant was responsible for the killing; and [(3)] the defendant acted with malice and a specific intent to kill." *Commonwealth v. Houser*, 18 A.3d 1128, 1133 (Pa. 2011) (internal citations omitted).

A killing is intentional if it is done in a "willful, deliberate and premediated fashion." 18 Pa.C.S.A. § 2502(d). The period of reflection needed to establish deliberation and premeditation may be as brief as a fraction of a second. *Commonwealth v. Rivera*, 983 A.2d 1211, 1220 (Pa. 2009). Indeed, the deliberation and premeditation needed to establish intent exist whenever the assailant possesses the conscious purpose to bring about death. *Id.* The Commonwealth may use circumstantial evidence to establish the elements of first-degree murder, including the element of intent. *Id.* Further, "[s]pecific intent to kill can be proven where the defendant knowingly applies deadly force to the person of another." *Commonwealth v. Stokes*, 78 A.3d 644, 650 (Pa. Super. 2013) (citation omitted).

Viewed in the light most favorable to the Commonwealth as the verdict winner, the evidence established that Ramsey shot Barto in the head, a vital part of her body, and that the gunshot wound caused Barto's death. *See* N.T.,

10/23/19, at 169-70 (wherein the forensic pathologist who performed Barto's autopsy testified that Barto's death was caused by a gunshot wound to the head); *see also Stokes*, *supra*. Additionally, Howard-George testified that, prior to Barto's death, Ramsey had expressed his issues with his relationship with Barto, that he believed that Barto was cheating on him, and that Ramsey wanted Barto, "gone [and] out of [Ramsey's] life." *Id.* at 184. Howard-George testified that, when Ramsey came to see him later that day, Ramsey stated that he and Barto had argued. Howard-George testified that, according to Ramsey, Ramsey had struck Barto with his ring, and "pulled out his gun and he fired twice. [Ramsey] said [Barto] was slumped, in the head, she's saying[, ']you shot me[,'] so he fired again." *Id.* at 189. Accordingly, the Commonwealth presented sufficient evidence to sustain Ramsey's conviction of first-degree murder, and we can grant him no relief on this claim.

In his third issue, Ramsey argues that the trial court erred in rendering a verdict only for first-degree murder, despite his requests for consideration of third-degree murder, voluntary manslaughter, and involuntary manslaughter. Brief for Appellant at 43-44. According to Ramsey, because a jury would have received instructions for each type of homicide and the same would have been reflected on a verdict slip if this had been a jury trial, the trial court should have considered, on the record, each degree of murder and manslaughter when rendering its verdict. *Id.*

Ramsey's appellate brief is devoid of any citations to legal authority supporting his position that the trial court erred in this regard, and merely quotes the criminal Complaint and his counsel's remarks during closing argument. *See id.* Accordingly, we conclude that Ramsey has waived this claim, as it is undeveloped for our review. *See* Pa.R.A.P. 2119(a) (providing that an appellant's argument shall include "such discussion and citation of authorities as are deemed pertinent."); *see also Commonwealth v. Johnson*, 985 A.2d 915, 924 (Pa. 2009) (stating that "where an appellate brief fails to provide any discussion of a claim with citation to relevant authority[,] or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.").

Nevertheless, the record confirms that Ramsey was charged with criminal homicide, 18 Pa.C.S.A. § 2501(a), which encompasses multiple degrees of homicide. At trial, Ramsey's counsel argued during closing argument that Ramsey was not guilty of first- or third-degree murder, and that the evidence, viewed most favorably to the Commonwealth, would only support a conviction of voluntary manslaughter. N.T., 10/25/19, at 175-76, 180-81. Counsel also argued that "worst case for [] Ramsey [is] an involuntary manslaughter." *Id.* We also note, as discussed *supra*, that Ramsey's conviction of first-degree murder was supported by sufficient evidence. Thus, the trial court was fully aware of the degrees of homicide

when it found Ramsey guilty of first-degree murder, and we discern no error or abuse of discretion in this regard.

Fourth, Ramsey argues that the trial court erred in denying Ramsey's post-sentence Motion claims of prosecutorial misconduct by the Butler County District Attorney's Office. Brief for Appellant at 44-51. Ramsey focuses on Howard-George's testimony at trial. *Id.* Ramsey asserts that, contrary to Howard-George's testimony that he was not receiving anything from the Commonwealth in exchange for his testimony, Howard-George entered into a plea agreement with the Commonwealth shortly after his testimony, which resulted in his release. *Id.* at 45-47. Ramsey claims that because such an agreement must have existed, the Commonwealth's concealment of the agreement constituted misconduct, and a violation of **Brady**.[8] *Id.* at 48-50. Ramsey indicates that had he known of the purported agreement between the Commonwealth and Howard-George, he would have been able to more effectively cross-examine Howard-George. *Id.* at 50-51.

It is well settled that **Brady** and subsequent precedent flowing therefrom imposes upon a prosecutor the obligation to disclose all favorable evidence that is material to the guilt or punishment of an accused, even in the absence of a specific request by the accused. **Commonwealth v. Strong**,

---

[8] **Brady v. Maryland**, 373 U.S. 63 (1963) (holding that the prosecution's suppression of evidence favorable to an accused, including impeachment or exculpatory evidence, violates the accused's constitutional due process rights, irrespective of the good or bad faith of the prosecution).

761 A.2d 1167, 1171 & n.5 (Pa. 2000). "[T]o establish a **Brady** violation, a defendant must demonstrate that: (1) the evidence was suppressed by the Commonwealth, either willfully or inadvertently; (2) the evidence was favorable to the defendant; and (3) the evidence was material, in that its omission resulted in prejudice to the defendant." **Commonwealth v. Haskins**, 60 A.3d 538, 547 (Pa. Super. 2012) (citations omitted). The defendant carries the burden to "prove by reference to the record, that evidence was withheld or suppressed by the prosecution." **Id.**

Moreover, under **Brady**, any implication, promise or understanding that the government would extend leniency in exchange for a witness's testimony is relevant to the witness's credibility. **See Commonwealth v. Burkhardt**, 833 A.2d 233, 241 (Pa. Super. 2003) (*en banc*) (citing **United States v. Giglio**, 405 U.S. 150 (1972)). The understanding between the prosecution and its testifying witness need not be in the form of a signed contract or a completed, ironclad agreement in order to qualify as **Brady** material. **See Commonwealth v. Chmiel**, 30 A.3d 1111, 1131 (Pa. 2011). Instead, **Brady** requires the Commonwealth to disclose not only definitive agreements, deals struck, and ironclad, signed, sealed contracts, but also any potential understanding between the prosecution and its witness, and any implication, promise, or understanding that the government would extend leniency in exchange for a witness's testimony. **See Commonwealth v. Kinard**, 95 A.3d 279, 290 (Pa. Super. 2014).

In its Opinion, the trial court addressed this issue as follows:

At [] trial, Howard-George was called to testify. During the cross[-]exam[ination], counsel for [Ramsey] questioned [] Howard-George as follows:

> [Counsel:] Are you expecting a benefit for your testimony today?
>
> [Howard-George:] No, I was not guaranteed anything. I was not told I was going to receive anything. Literally, I'm getting nothing out of this.
>
> Q[.] Are you expecting something?
>
> A[.] No, I'm not expecting anything. The only thing I expect to do is prove that I didn't conspire to a homicide.

N.T. [()Trial[)], 10/23/[]19[,] at 248. The questioning continued[,]

> Q[.] What are you expecting the district attorney to do for you, sir?
>
> A[.] I don't expect the DA to do anything. The only person I expect anything of is my lawyer.
>
> Q[.] Nobody told you to sit quietly and all will be well?
>
> A[.] No.

*Id.*

[Howard-George] pleaded guilty to Abuse of Corpse under 18 Pa.C.S.[A.] § 5510 and Tampering with Evidence under 18 Pa.C.S.[A. §] 4910(1) on November 13, 2019. At the plea hearing, when asked[,] "Has anyone made any threats or promises to induce you to plead guilty?" Howard-George responded[,] "no." N.T. [(Howard-George] Guilty Plea[)], 11/12/[]19[,] at 6. Additionally, at the argument for [p]ost-[s]entence Motions, [Ramsey] presented no evidence to support his claim. Therefore, throughout the testimony at trial and at the time for arguments on [Ramsey]'s [p]ost[-s]entence Motions, [Ramsey] has failed to adduce any evidence to support the claim

that an agreement existed between the Commonwealth and [Howard-George] meant to elicit [Howard-George]'s testimony.

Trial Court Opinion, 10/20/20, at 10-11.

We discern no abuse of discretion in the trial court's denial of Ramsey's post-sentence Motion on these grounds. As stated by the trial court, Ramsey has failed to proffer evidence that the Commonwealth made promises to, or made a deal with, Howard-George at the time of Ramsey's trial. Rather, Ramsey's allegations are based on the fact that Howard-George's conspiracy to commit homicide charge was dropped, and he entered into a negotiated plea agreement a few weeks *after* he testified against Ramsey. This, alone, is insufficient to prove a **Brady** violation. **See Commonwealth v. Morales**, 701 A.2d 516, 522-523 (Pa. 1997) (declining to find a **Brady** violation based on alleged plea deal with witness where appellant offered nothing besides mere conjecture that such an arrangement existed); **see also Commonwealth v. Tielsch**, 934 A.2d 81, 88 (Pa. Super. 2007) (holding that appellant's allegation that the district attorney had promised to assist in efforts to gain a reduction in the witness's federal sentence is not sufficient to establish that such an agreement, in fact, existed either before or at the time of trial); **Commonwealth v. Champney**, 832 A.2d 403, 412 (Pa. 2003) (holding that appellant's assumption that a promise must have existed to assist in reducing a witness's federal sentence is not sufficient to establish that such an agreement, in fact, existed). Accordingly, we can grant Ramsey no relief on this claim.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/16/2021